UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

INNOGENETICS, N.V.,

        Plaintiff,

vs.                                                 Civil Action No. 05-C-0575-C

ABBOTT LABORATORIES,

        Defendant.

**ABBOTT LABORATORIES' BRIEF IN OPPOSITION TO INNOGENETICS' MOTION TO STRIKE SUPPLEMENT TO EXPERT REPORT OF BRUCE K. PATTERSON, M.D.**

### INTRODUCTION

      Abbott Laboratories on May 19, 2006 served Innogenetics with a supplement to the invalidity report of its expert in this patent case, Bruce K. Patterson, M.D., pursuant to Rule 26(e), Fed. R. Civ. P., to correct a citation error and oversights in his first report. Innogenetics claims it has been surprised and prejudiced by this supplement, and has moved the Court to strike it. However, given the nature of the supplement, which pertains exclusively to prior art discussed in Dr. Patterson's first report, and in light of the parties' agreement concerning a "second round" of expert depositions this month, there can be neither surprise nor prejudice. Dr. Patterson's supplement complies with the Court's pretrial order, and Innogenetics will have ample opportunity to question Dr. Patterson about his supplemental opinions. Innogenetics' motion should be denied.

### ARGUMENT

      When faced with a motion to strike supplemental expert discovery, courts generally consider the alleged prejudice and surprise suffered by the moving party and the ability to cure such prejudice. *See, e.g., Carey v. Hy-Temp Mfg., Inc.*, 1991 WL 161394 at *5 (N.D. Ill. 1991)

1

(citing *Johnson v. H.K. Webster, Inc.*, 775 F.2d 1, 7 (1st Cir. 1985)). Dr. Patterson's supplement, pertaining to prior art that has long since been disclosed in this litigation, creates no surprise and there is no prejudice because Innogenetics can examine Dr. Patterson on his supplemental opinions during his upcoming deposition. Even if the Court should credit Innogenetics' claimed surprise, the appropriate resolution would be to permit Innogenetics' expert to respond to the supplement. *See, e.g., Johnson*, 775 F.2d at 8 (noting, in refusing to award "the far more drastic remedy of excluding the [expert] testimony in issue[, that c]ourts have looked with disfavor upon parties who claim surprise and prejudice but who do not ask for a recess so they may attempt to counter the opponent's testimony.") (citations omitted); *see also BASF Corp. v. Old World Trading Co.*, 1992 WL 22201 at *5 (N.D. Ill. 1992) ("[I]t is significant that Old World is not requesting the opportunity to redepose [BASF's expert, who provided data after his deposition] …. Old World's decision to seek exclusion as the primary remedy … belies its claim of prejudice and surprise, and exposes its motion for what it is: an attempt to exclude what may be damaging evidence. Old World's motion to bar the use of the [] data is therefore denied.").[1] The fact is, Innogenetics cannot legitimately claim surprise or prejudice.

**I.  Innogenetics Cannot Reasonably Claim Surprise, As Dr. Patterson's Supplement Addresses Only Prior Art Which He Discussed In His First Report.**

Dr. Patterson's supplement relies only on prior art discussed in his first report. Specifically, the supplement addresses three references: the "Kanai article," the "Cha PCT Application," and the "'718 patent," each addressed below in turn. First, the Kanai article, as

---

[1]  *Johnson* and *BASF* were decided before the 1993 amendment to Rule 26(e), which requires supplementation to expert reports to reflect any changes in opinions "expressed by the expert whether in the report or at a subsequent deposition …." Fed. R. Civ. P. 26(e) advisory committee's note (1993 Amendments). Dr. Patterson's upcoming deposition will surely elicit testimony about the prior art references. To the extent such testimony could be considered "changes in the opinions" of Dr. Patterson, *id.*, Abbott would need to supplement his report after his deposition according to the Rule. Rather than waiting for this possibility, Abbott already provided Dr. Patterson's supplement.

2

Dr. Patterson explains in his supplement, was published in 1992 in *The Lancet*. Dr. Patterson discussed it in his first report, but mistakenly provided an incorrect citation (to another article by the same Dr. Kanai, which appeared in a 1990 issue of the same publication, *The Lancet*, and which related to the same hepatitis C virus). *See* Declaration of Bruce K. Patterson, M.D., Dkt. No. 58 ("Patterson Decl."), ¶ 49. His supplement corrects this mistake and includes a proper citation and copy of the reference itself.

Dr. Patterson had not noticed the oversight at the time of his first deposition, but the text of Dr. Patterson's first report and his deposition testimony make clear that he was discussing, and intended to cite, to the 1992 Kanai article. For example, Dr. Patterson wrote, "According to Kanai, patients with HCV Genotype III responded much better to interferon than Genotype II or Genotype IV." Expert Report of Bruce K. Patterson, Dkt. No. 33 ("First Patterson Report"), at 22. The 1992 Kanai article precisely describes this observation: "… HCV RNA levels were much decreased [by interferon] in type III patients …. Only 14 (20%) patients with type II and 2 of 6 with type IV responded." Supplemental Expert Report of Bruce K. Patterson, Dkt. No. 59 ("Patterson Supp."), Exh. A. Dr. Patterson's deposition testimony also establishes that his reference of Dr. Kanai's derived form the 1992 article.[2] Dr. Patterson's supplement simply corrects an honest mistake.

Innogenetics complains that by fixing this mistake and providing the correct Kanai reference, Abbott has violated the Court's scheduling order in some nefarious scheme to sneak in a rebuttal to Innogenetics' expert's report. *See* Brief in Support of Motion to Strike, Dkt. No. 61

---

[2]   Dr. Patterson testified specifically about the Kanai article "in 1992," and referred to content that only appeared in that article: "[I]t was clear from the Kanai article that genotypes 3 and 4 responded different – and 2, responded differently to therapy …. I know *the Kanai article in 1992* in the Lancet used the Roman numeral numbering system to classify genotypes in to treatment categories …. *In 1992*, Kanai assigned genotypes using Roman numerals in the Lancet …." Declaration of Gabriel S. Gross, Exh. A (189:1-5, 191:15-17, 193:10-11) (emphasis added).

("Inno. Brief"), at 4-5. Tellingly, Innogenetics did not take such an extreme position when the parties met and conferred. In its "meet and confer" letter, its counsel wrote, "Section A of Dr. Patterson's supplemental report ("Proper Citation to Kanai, et al.") appears to be a straightforward correction of a mistaken citation in his first report. Innogenetics has no objection to Abbott correcting this citation." June 1, 2006 Declaration of Lissa R. Koop, Dkt. No. 62 ("Koop Decl."), Exh. 4 at 1. But now, Innogenetics has changed its approach, saying that "upon closer inspection," Dr. Patterson's correction of the Kanai citation is improper. Inno Brief at 2, n. 3. Innogenetics' "closer inspection" appears to have been of its own expert's report, from which it selectively quotes comments about Kanai's work in an effort to recast Dr. Patterson's supplement as an improper rebuttal report. *See* Inno. Brief at 4-5. The Court should not be persuaded, and should recognize Dr. Patterson's report for what it is – an appropriate correction on an oversight through timely supplementation.

Second, Dr. Patterson clarifies his reliance on a key piece of prior art in this case, the Cha PCT Application. In his first report, Dr. Patterson wrote about and described "probes taught by Cha [that] specifically hybridize to the 5'-UT region." First Patterson Report at 12-17. Included throughout his first report are numerous discussions of Cha's probes "77" and "78," which Dr. Patterson describes at length. For just a few examples, *see id.* at 11 ("HCV is genotyped using genotype-specific probes (SEQ IDs 77 and 78) …."); *id.* at 14 ("… Sequence No. 77 (5'-UT) was used to detect Genotype III, Sequence No. 78 (5'-UT) was used to detect Genotype IV.") (quoting the Cha PCT Application); *id.* at 15 (citing Cha's description of SEQ IDs 77 and 78); *id.* at 15 ("[T]he Cha Application SEQ IDs 78 and 120-125 encompass entirely the regions identified in claim 3 ….").

In Dr. Patterson's supplement, he clarifies how Cha's probes 77 and 78 apply to the nomenclature and sequence numbering used by Innogenetics in, among others, claims 2, 3, 6 and

4

7. As Dr. Patterson explained, this exercise was intended "[t]o avoid any confusion about the nucleotide position of these probes using the nomenclature of the '704 patent," which nomenclature varies from the nomenclature and numbering system used in the Cha PCT Application to describe the same nucleotide positions. Patterson Supp. at 1. Every comment in his supplement is consistent with his original statements about the Cha PCT Application in his first report, including his opinion about claim 1, from which all other claims in Innogenetics' patent depend:

> [T]he Cha Application teaches using a probe that specifically hybridizes to the domain extending from the nucleotides at positions -291 to -66 of the 5'-UT region of HCV. … see also Cha [PCT] Application, p. 36 (listing SEQ IDs 77 and 78).

First Patterson Report at 15. Dr. Patterson's opinion that the Cha PCT Application is an invalidating prior art reference has never wavered, nor was it altered by his supplement.

Nothing about the Cha PCT Application should surprise Innogenetics, as it knows this prior art reference intimately. The Cha PCT Application has been at issue in this case since the beginning, when Abbott first invoked it by application number in its affirmative defense of patent invalidity. *See* Answer, Affirmative Defenses and Counterclaim of Abbott Laboratories, (Dkt. Nos. 7-8), pp. 3-4. Innogenetics has been dealing with the Cha PCT Application for years, at least as early as 1994, when it was forced to amend its claims in a corresponding European patent application to avoid the teachings of the Cha PCT Application, specifically with respect to probes 77 and 78. *See* Declaration of Devanand J. Crease, Dkt. Nos. 56-57, Exh. A (European File Wrapper) at AB17944-45, AB17846, AB17852-53. Innogenetics' claim of surprise because Dr. Patterson supplemented his report regarding the Cha PCT Application's probes 77 and 78, when he already had discussed Cha's use of those probes for genotyping HCV and Innogenetics had known independently of this prior art for years, is simply untenable.

Third, Dr. Patterson supplemented his report with respect to another prior art reference, the '718 patent. *See* Patterson Supp. at 2. Again, this is a reference Dr. Patterson described extensively in and included with his first report. *See* First Patterson Report at 19-21, 23-31. In his first report, Dr. Patterson clearly stated his opinion with respect to Innogenetics' claim 1, from which all of the claims in Innogenetics' patent depend: "The '718 patent teaches using oligonucleotide probes hybridizing to domains contained within the nucleotide domain -291 to -66 of the 5'-UT region of HCV." *Id.* at 19. Referring to a table of probe sequences numbered 1-14 in the '718 patent, Dr. Patterson described the use of probes targeting a specific region to classify and detect different types of HCV, discussing as an example a probe called SEQ ID NO. 8. *Id.* at 19-20 ("For example, probe sequence identification number 8 binds to the nucleotide domain -244 to -221.") (citing Table 1 of the '718 patent). In his supplement, Dr. Patterson clarified that other probes from the same Table 1 in the '718 patent, specifically SEQ ID NO. 9, were used in the same fashion. *See* Patterson Supp. at 2-3. Dr. Patterson explains how the '718 patent's probes 8 and 9 apply to the nomenclature and sequence numbering used by Innogenetics' '704 patent, including as they are used in claims 1-3 and 9. *Id.* Every comment in his supplement is consistent with and reinforces Dr. Patterson's opinion in his first report, namely, that "[t]he '718 patent teaches using oligonucleotides probes hybridizing to domains contained within the nucleotide domain -291 to -66 of the 5'-UT region of HCV." First Patterson Report at 19. Dr. Patterson's opinion remains that the '718 patent is an invalidating prior art reference to Innogenetics' '704 patent.

**II.    Dr. Patterson's Supplement Complies With The Court's Preliminary Pretrial Conference Order, Which Contemplates Such Limited Supplementation.**

The Court's order establishes clear rules for supplemental expert reports: (1) there shall be no rebuttal reports, (2) supplementation is limited to matters raised in an expert's first report, (3) it must be in writing, and (4) it be served no later than five days before the expert's

6

deposition.  *See* Nov. 22, 2005 Preliminary Pretrial Conference Order, Dkt. No. 12, at 2.

Dr. Patterson's supplement meets these criteria.

With respect to the first two requirements, *none* of Dr. Patterson's supplement is rebuttal material, as it is appropriately limited to his first report.  Of course, Innogenetics can point to portions of its own expert's report that address some of the same topics as Dr. Patterson's supplement, *see* Inno. Brief at 4-5, but this reflects nothing more than the fact that both parties retained experts to opine on the prior art.  Dr. Patterson naturally has different opinions than Innogenetics' expert, Dr. Worman – but Dr. Patterson's supplement does not endeavor to rebut Dr. Worman's work.  The supplement specifically "is limited to matters raised in an expert's first report," namely, three prior art references Dr. Patterson already had discussed at length.  The only arguably "new" material was the copy of the 1992 Kanai article – which Dr. Patterson already had discussed – that was included in the supplement to correct a mistaken citation in the first report.  Patterson Decl., ¶ 49.  His supplement complies with both the spirit and the literal language of the Court's first two criteria.

Dr. Patterson's report also complies with the last two criteria, as it was provided in writing on May 19, 2006, weeks before Dr. Patterson's upcoming deposition.  The parties largely had agreed upon procedures relating to expert discovery, including working around their experts' schedules.  Innogenetics' counsel specifically suggested having two rounds of expert depositions, and proposed some dates.  In a May 11, 2006 communication to Abbott's counsel, Innogenetics' attorney wrote:

> It is better for Dr. Reznikoff [one of the plaintiff's experts] to be deposed on June 6 or June 7.  Like Dr. Patterson, he has plans that make it very difficult for him to be deposed next week.  I suggest that we try to use the week of June 5-9 for our "second round" of expert depositions.  I assume that Dr. Patterson can be available for a day during this period.  We will try to provide Dr. Worman and Mr. Sofocleous [other plaintiff's experts] during this week as well.

7

Declaration of Gabriel S. Gross (accompanying this brief) ("Gross Decl."), Exh. B.  Although dates and times have yet to be finalized, there is no dispute that the parties will proceed with additional expert depositions.  Dr. Patterson's report was provided on May 19, 2006, weeks in advance of his upcoming deposition, satisfying the last criterion for expert supplements.  Dr. Patterson's short supplement, regarding prior art already addressed in his first report and provided in writing (with the exception of the 1992 Kanai article) well in advance of his deposition, is an appropriate supplementation contemplated by the Court's order.

Nonetheless, if Innogenetics feels compelled to respond to Dr. Patterson's supplement, Abbott will not object to a similarly limited supplement from Innogenetics' expert, which is a far more reasonable alternative than striking an expert's supplemental report before his upcoming deposition, months before trial, and before the Court's ruling on a claim construction or summary judgment.  *See BASF*, 1992 WL 22201 at *5.

### III.    Given The Parties' Plan To Proceed With A Second Round Of Expert Depositions, Innogenetics Has Not Been Prejudiced.

Because of the upcoming expert depositions, Innogenetics will have every opportunity to question Dr. Patterson on all of his opinions, including any in his supplement.  Innogenetics' counsel proposed two rounds of expert depositions, to which Abbott agreed.  The first round of Dr. Patterson's deposition focused largely on his credentials and experience; Innogenetics' counsel barely questioned Dr. Patterson, if at all, about any opinions in his first report regarding the Cha PCT Application or the '718 patent, instead suspending the examination with the understanding that "we'll pick it up later."  Gross Decl., Exh. A (160:5-9, 200:12-13) Dr. Patterson's second deposition has yet to occur, but it surely will involve substantive questioning about his opinions on invalidity in light of the prior art and on issues of non-infringement, on which he opined in a second report.  Given what appears to have been Innogenetics' strategic decision to defer until the second deposition substantive questioning

relating to the prior art in Dr. Patterson's first report, it is hard to understand how Innogenetics has been prejudiced by a supplement that pertains to the same references.

Dr. Patterson's supplement was submitted with full attention to and in compliance with the Court's expectations for expert supplementation. It has hardly left Innogenetics in a "precarious position," *see* Inno. Brief at 8, since it was provided well before Dr. Patterson's deposition and pertains to the same prior art described in his first report. For all of these reasons, striking the supplement is unwarranted here and the motion should be denied.

Innogenetics misplaces its reliance on authority to urge the severe remedy of striking Dr. Patterson's supplement. In *Ruhland v. Walter Kidde Portable Equip., Inc.*, for example, this court struck a plaintiff's expert *disclosure* because the plaintiff disclosed three experts more than two months after the deadline for disclosing expert witnesses. 179 F.R.D. 246, 248 (W.D. Wis. 1998). The courts in *Olsen v. Marshall & Ilsley Corp.*, 2000 WL 34233699 at *1 (Case No. 99-C-0774-C) (W.D. Wis. 2000) and *Ctr. Dev. Venture v. Kinney Shoe Corp.*, 757 F. Supp. 34, 36 (E.D. Wis. 1991) dealt not with expert's supplements, but with improper affidavits submitted with final summary judgment *reply* briefs, in efforts to propose new facts. This court in *Briggs & Stratton Corp. v. Kohler Co.*, 398 F. Supp. 2d 925, 931 (W.D. Wis. 2005) excluded an expert's declaration, but the content of that declaration had neither been disclosed in an expert report nor before the filing of responsive summary judgment briefs.

In stark contrast, Dr. Patterson's supplement was provided under entirely different facts. Abbott's experts were timely disclosed, Dr. Patterson's supplement deals with previously disclosed and discussed prior art and his supplement was provided well in advance of his deposition. Abbott explained all of this to Innogenetics in a May 26, 2006 letter, making clear why a motion to strike the supplement would be groundless and would be denied. Gross Decl.,

9

Exh. C. Nevertheless, here we are. In these circumstances, and in light of the upcoming depositions and the ample time remaining before trial, Innogenetics' motion should be denied.

## CONCLUSION

Innogenetics cannot show that it has been unfairly surprised or prejudiced by Dr. Patterson's supplement to his report on invalidity and, accordingly, the Court should deny its motion to strike. Because Abbott complied with the Court's order on supplementation and explained this explicitly to Innogenetics, the Court should award Abbott its fees and costs under Rule 37, Fed. R. Civ. P. in defending against Innogenetics' unnecessary motion.

**ABBOTT LABORATORIES**

Dated: June 6, 2006        By:        *s/Gabriel S. Gross*
                                      Eugenia G. Carter
                                      Jeffrey A. McIntyre
                                      Gabriel S. Gross
                                      *Counsel for Defendant Abbott Laboratories*

OF COUNSEL

Whyte Hirschboeck Dudek S.C.
One East Main Street, Suite 300
Madison, Wisconsin 53703-3300
tel: (608) 255-4440
fax: (608) 258-7138
e-mail: ggross@whdlaw.com